J-S32040-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MARVIN L. FLAMER, | |
| Appellant | No. 2681 EDA 2014 |

Appeal from the Judgment of Sentence March 14, 2014
in the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0007716-2009

BEFORE:  BOWES, J., MUNDY, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                          **FILED May 11, 2016**

Appellant, Marvin L. Flamer, appeals from the judgment of sentence imposed following his jury conviction of one count each of first-degree murder and criminal conspiracy to commit murder.[1]  We affirm.

This case arises from the fourteen-bullet shooting of Allen Moment, Jr. on a Philadelphia street in an ambush carried out by his extended family members; Moment died from his injuries approximately two-and-a-half years later.  The trial court summarized the factual background as follows:

> In early January, 2006, Allen Moment, Jr. was acting as peacemaker between two feuding groups of people in the area of 22nd Street and Pierce Street in Philadelphia, Pennsylvania. Moment was the cousin of both [Appellant] and co-defendant

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a) and 903(a)(1), respectively.

Nafeast Flamer, who was [Appellant's] nephew. During the ongoing feud, Moment arranged to meet with Nafeast Flamer and Hakim Bond in order to return a firearm that Moment had taken from Nafeast Flamer. Abdul Taylor encountered Nafeast Flamer and Bond as they waited for Moment. Shortly after Moment failed to arrive at the meeting, Nafeast Flamer, Bond, and Taylor were fired upon by some unknown assailant. Nafeast Flamer believed that Moment had set them up, and told Taylor that there had been talk about "getting" Moment since then. On January 18, 2006, Taylor encountered a group of people in a lot on Ellsworth Street planning to go harm Moment. Nafeast Flamer and Bond were among this group. Taylor saw approximately seven guns among the individuals.

On January 20, 2006, at approximately 8:50 p.m., Moment was walking on Pierce Street, near the intersection with 22nd Street, when he was approached by Nafeast Flamer, Bond, and two other individuals wearing dark hoodies. As this group approached Moment, a friend of Moment's, Shareem Nelson, called Moment and informed him of the group's approach. Moment responded "I'm cool, they are my peoples." Once Nafeast Flamer and his companions reached Moment, the group opened fire on Moment, striking him approximately thirteen to fourteen times in the stomach, groin, and thigh areas.

[Appellant] drove the get-away car for the shooters. When Moment tried to run to flee from the shooters, [Appellant] used his car to block Moment's flight.

Tony Waters, an off duty police officer who lived in the area, heard the gunshots and called 911. Police officers and paramedics arrived on the scene shortly thereafter and transported Moment to the Hospital at the University of Pennsylvania. Doctors determined that Moment's bowel was eviscerating out of his abdomen and he was taken to surgery immediately. Over the course of the next two and a half years in the hospital, Moment was treated by Dr. Carrie Sims and suffered kidney failure, an open wound in his abdomen, a perforated digestive system, repeated infections, tracheostomy, fluid collection around his heart, depression, and a hemorrhagic stroke.

Shortly after the shooting, [Appellant] moved from Philadelphia to Charlotte, North Carolina. While in North

Carolina, [Appellant] contacted Taylor by telephone and asked him to say on the night Moment was shot, [Appellant] and Taylor were together. Taylor refused to provide this false alibi for [Appellant].

In late January, 2008, Dr. Sims called a family meeting in Moment's hospital room and informed Moment that, while he had put up a good fight, he was dying and that he would not be leaving the hospital. While Moment could not move his body, Moment could communicate through head gestures and labored talking. After this meeting, Moment asked, after some insistence from his mother, to talk to a detective. On February 4, 2008, Moment was interviewed by Philadelphia Police detectives in the presence of his mother, Patricia Gooding, and uncle, Marquet Parsons. In this interview, Moment identified Nafeast Flamer and Bond as the individuals who shot him. Moment further identified [Appellant] as driving the get-away car and stated that [Appellant] used that car to block his flight from the shooters. Moment identified all three individuals in a photo array. Moment informed Parsons that he did not talk to police prior to this interview because he didn't want to be "called a snitch." On February 14, 2008, Moment provided a videotaped interview in his hospital room. Moment eventually succumbed to his injuries and died on August 6, 2008.

Following Moment's death, Abdul Taylor began cooperating with police and gave a statement on August 13, 2008. While this matter was pending for trial, Taylor informed his mother that he feared being called a snitch and told her that "they goin' kill me, they got a hit out on me." While incarcerated, [Appellant] received visits from Derrick "Heavy" White. White killed Taylor as Taylor's testimony would prevent "Nafeast and them" from coming home. On May 7, 2010, White shot Taylor in the head, killing him. . . .

(Trial Court Opinion, 11/13/14, at 2-5) (record citations and footnote omitted).

Appellant proceeded to trial with co-defendant Nafeast Flamer,[2] and the jury found him guilty of the above-mentioned offenses on January 23, 2014. On March 14, 2014, the court imposed an aggregate sentence of incarceration of life without parole plus not less than twenty nor more than forty years. The court denied Appellant's timely post-sentence motion on August 18, 2014. This timely appeal followed.[3]

Appellant raises two issues for this Court's review:

> I. Is the [Appellant] entitled to an arrest of judgment on the charge of Murder in the First Degree as well as on the charge of Criminal Conspiracy to Commit Murder where the verdict is not supported by sufficient evidence?
>
> II. Is the [Appellant] entitled to a new trial on the charge of Murder in the First Degree and Criminal Conspiracy to Commit Murder where the verdict is not supported by the greater weight of the evidence?

(Appellant's Brief, at 3).

In his first issue, Appellant challenges the sufficiency of the evidence supporting his first-degree murder and criminal conspiracy to commit murder convictions. (*See id.* at 9-14). Appellant asserts that: he did not shoot and kill the victim; the record is devoid of proof that he was a co-conspirator to the murder; and "he was sent to prison for life on a guess."

---

[2] Co-defendant Hakim Bond was tried separately. (*See* Trial Ct. Op., at 1).

[3] Pursuant to the trial court's order, Appellant filed a timely concise statement of errors complained of on appeal on October 7, 2014. The trial court entered an opinion on November 13, 2014. *See* Pa.R.A.P. 1925.

(***Id.*** at 10; ***see id.*** at 9, 14).  Appellant avers that, at most, the evidence merely establishes that he "agreed to drive a vehicle with others in it[]"; there is no evidence that he agreed with Nafeast Flamer or anyone else to shoot and kill Moment.  (***Id.*** at 12).  We disagree.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Giordano***, 121 A.3d 998, 1002-03 (Pa. Super. 2015), *appeal denied*, 131 A.3d 490 (Pa. 2016) (citations omitted).

The Pennsylvania Crimes Code defines the offense of first-degree murder as a criminal homicide that is "committed by an intentional killing." 18 Pa.C.S.A. § 2502(a).  In order for an individual to be convicted of first-degree murder, "the Commonwealth must prove that a human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill." ***Commonwealth***

*v. Johnson*, 107 A.3d 52, 66 (Pa. 2014), *cert. denied sub nom. Johnson v. Pennsylvania*, 136 S.Ct. 43 (2015) (citation omitted). "It is well-settled that specific intent to kill can be established through circumstantial evidence such as the use of a deadly weapon on a vital part of the victim's body." *Id.* (citation omitted).

Section 903 of the Crimes Code sets forth the crime of criminal conspiracy, in pertinent part, as follows:

> **(a) Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime[.]

18 Pa.C.S.A. § 903(a)(1).

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish the defendant: 1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Feliciano*, 67 A.3d 19, 25-26 (Pa. Super. 2013) (*en banc*), *appeal denied*, 81 A.3d 75 (Pa. 2013) (citation omitted). "The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt." *Id.* at 26 (citation omitted).

> The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is

criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action.

***Commonwealth v. Lambert***, 795 A.2d 1010, 1016-17 (Pa. Super. 2002),

*appeal denied*, 805 A.2d 521 (Pa. 2002) (citation omitted).

Here, the trial court determined that Appellant's sufficiency claim is meritless, explaining:

> The evidence presented in this case clearly demonstrated that [Appellant], together with Nafeast Flamer and Hakim Bond, conspired to murder Alan Moment, Jr. Only days before Moment's shooting, Abdul Taylor witnessed [Appellant's] nephew, Nafeast Flamer, along with Hakim Bond, "plotting to go down . . . to harm [Moment]" while possessing several firearms. (N.T. Trial, 1/14/14, at 83; *see id.* at 84; *see also* N.T. Trial, 1/15/14, at 221-22). Shareem Nelson, Jeffrey Chandler, Jr., and Aisha Williams each testified that they witnessed multiple individuals in dark hoodies approach Moment at the corner of 22nd Street, where they shot Moment multiple times in the abdomen, pelvis, and upper thighs. (*See* N.T. Trial, 1/14/14, at 113-15; 134-36, 156-57; *see also* N.T. Trial, 1/15/14, at 178-80). Both Aisha Williams and Moment identified Nafeast Flamer and Bond as the shooters. (*See* N.T. Trial, 1/15/14, at 87, 180-81).
>
> [Appellant's] role in the conspiracy was established by compelling evidence. Moment, in his deathbed statement to police, identified [Appellant], who was his cousin, as the driver of the getaway car. (*See* N.T. Trial, 1/15/14, at 88). According to Moment, [Appellant] also actively participated in the killing, using [the] getaway car to prevent Moment from fleeing from the shooters. As Moment described it, [Appellant] "tried to trap me with the car." (*Id.*). Aisha Williams, who knew [Appellant] all her life, corroborated Moment's contention that [Appellant] drove the getaway car. She saw [Appellant] sitting behind the wheel of his car at the corner near the shooting just before the

shooting occurred, saw him drive the car slowly toward Moment, and then heard gunshots. (**See** N.T. Trial, 1/15/14, at 179-80; **see also** N.T. Trial, 1/16/14, at 71-72).

In addition, the Commonwealth presented compelling evidence to demonstrate [Appellant's] consciousness of guilt. Moment's father, Alan Moment, Sr., testified that soon after the shooting [Appellant] moved from Philadelphia to Charlotte, North Carolina. (**See** N.T. Trial, 1/15/14, at 223). Taylor, in his statement to police, stated that [Appellant] called Taylor from North Carolina and asked Taylor to provide [Appellant] with an alibi by falsely stating that Taylor and [Appellant] were together in a studio at the time of the murder, when in fact, Taylor and [Appellant] were not together at all that night. (**See** N.T. Trial, 1/14/14, at 90).

\* \* \*

[T]he evidence established that [Appellant], Nafeast Flamer and Hakim Bond conspired to kill Alan Moment, and that pursuant to that conspiracy, Nafeast Flamer and Bond repeatedly shot Moment, causing the death. This was done with the aid and assistance of [Appellant], who drove the getaway car and prevented Moment from fleeing the shooters. . . .

(Trial Ct. Op., at 7-9) (record citation formatting provided).

After review of the record, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, **see Giordano**, **supra** at 1002, we agree with the trial court's assessment of Appellant's sufficiency claim. The evidence clearly demonstrates that Appellant conspired with Nafeast Flamer and Bond to kill Moment, and that he actively participated in the murder by deliberately using his car to prevent Moment's escape from the barrage of bullets. Accordingly, Appellant's first issue does not merit relief.

In his second issue, Appellant challenges the weight of the evidence to support his first-degree murder and conspiracy to commit murder convictions. (**See** Appellant's Brief, at 15-16).[4] Appellant argues that he is entitled to a new trial because the greater weight of the evidence does not establish that he agreed with his co-defendants to murder Moment. (**See** **id.**). We disagree.

Our standard of review is as follows:

> The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses.
>
> As an appellate court, we cannot substitute our judgment for that of the finder of fact. Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock one's sense of justice. A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when the figure of Justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.
>
> Furthermore, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

---

[4] Appellant preserved his challenge to the weight of the evidence by raising it in a post-sentence motion. **See** Pa.R.Crim.P. 607(A)(3).

*Commonwealth v. Boyd*, 73 A.3d 1269, 1274-75 (Pa. Super. 2013) (*en banc*) (citation and quotation marks omitted). "[T]he trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Weathers*, 95 A.3d 908, 911 (Pa. Super. 2014), *appeal denied*, 106 A.3d 726 (Pa. 2015) (citation omitted). When reviewing a weight claim, this Court carefully considers the findings of the trial court, because the trial judge had the opportunity to hear and see the evidence presented. *See Commonwealth v. Brown*, 48 A.3d 426, 432 (Pa. Super. 2012), *appeal denied*, 63 A.3d 1243 (Pa. 2013).

Here, the trial court denied Appellant's motion for a new trial, finding that the evidence fully supported the jury's verdict where it plainly reflected that Appellant worked in concert with his co-defendants to shoot and kill Moment. (*See* Trial Ct. Op., at 8, 10). After review of the record, we agree with the trial court, and thus cannot conclude that its ruling on Appellant's weight claim constituted a palpable abuse of discretion. *See Boyd*, *supra* at 1275. Therefore, Appellant's second issue does not merit relief. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/11/2016